Whitaker, Judge,
delivered the opinion of the court:
The plaintiffs in the above styled cases were supervisory employees at the New York Naval Shipyard, Brooklyn, New York. Upon the termination of World War II, quite a number of employees of the shipyard were discharged, which resulted in an excess number of supervisory employees, necessitating a reduction in the force of these supervisory employees. Plaintiffs were demoted incident to this reduction in force. They were veterans and were, therefore, preference eligibles.
The commissioner of this court reports that as to 15 of these plaintiffs it has been stipulated that “at least one competing non-veteran with lower retention rights was retained by the Navy Department in each plaintiff’s grade.” The commissioner also reports that it has been stipulated that as to these 15 they “did not appeal their demotions to the Civil Service Commission.” The names of these employees are as follows:
John R. Baker.
William J. Bradshaw.
William L. Campbell.
Fred W. Gruber.
Charles E. Kircher.
Edward I. Kwitchoff.
Alexander F. Manfredi.
Clyde H. Pettit.
Dickson Watson.
Ernest E. Rosenstrom.
Charles Simonson.
Otto Ubell.
John F. Schneider.
Sidney J. Smith.
Joseph Petrotta.
*202 In addition to these employees, the following plaintiffs took no appeal to the Commission on the ground that their preference rights had been violated, except one, Michael Gel-fat, and he withdrew his appeal before final action by the Commission. The names of these plaintiffs are as follows:
John A. Adler.
Alfred M. Johnson.
Michael Gelfat.
Frank Rom.
Robert E. Himwich.
Issac Sussman.
Henry Horr.
Defendant defends on the ground that the named plaintiffs did not exhaust their administrative remedies.
In the great majority of cases where plaintiffs have failed to exhaust their administrative remedies the courts have held that their suits are at least premature; that an action in court will not lie until after the administrative remedies have been exhausted. This is the general rule, but there are exceptions to it.
Perhaps the best guide for the application of the rule is that stated in United States v. Abilene & Southern Railway Co., 265 U. S. 274, in which the Court said:
* * * Whether it [the court] should have denied relief until all possible administrative remedies had been exhausted was a matter which called for the exercise of its judicial discretion. We cannot say that, in denying the motion to dismiss, the discretion was abused.
In other words, there is no absolute requirement that a party exhaust his administrative remedies before coming into •court. The court may entertain his suit before he has done so, if in its discretion it thinks the circumstances make it appropriate to do so. We are, of course, speaking of a case where the statute itself does not make the exhaustion of ■administrative remedies a prerequisite to suit. The statute in question here (58 Stat. 390; 61 Stat. 723; 5 U. S. C. Supp. V, 863) does not make an appeal to the Civil Service Commission a prerequisite to the bringing of a suit by a discharged or demoted employee. The statute provides that the employee “shall have the right to appeal” to the Civil Service Commission. The applicable Civil Service Commission regulation provides that such an employee “may appeal,” *203 -etc. Neither the statute nor the regulation says that he shall do so.
But, notwithstanding the fact that the appeal is not mandatory, we think that an employee must appeal to the Civil Service Commission for an adjustment of his grievances before resorting to the courts, except in unusual circumstances. We think so because the Civil Service Commission was the agency set up by Congress for the express purpose of hearing the grievances of employees. Congress conferred on the Commission jurisdiction to hear these grievances; it did not confer this jurisdiction on the courts, except where the Commission had acted unlawfully. So, it is to the Commission that an employee must resort, in the first instance; and until that Commission has finally passed on the case, the courts should not take jurisdiction, and then only where the Commission has misapplied the statute under which the employee claims, or in some other way has deprived the employee of the rights to which the law entitles him.
This is the general rule, but it is not without its exceptions. In John Cuiffo v. United States, 131 C. Cls. 60, we dealt with a case to which we thought the general rule did not apply. We did not think it applied because the Chief of the Civilian Personnel Branch of the Personnel and Administrative Division of the Port of Embarkation, which had issued the order separating the employee from the service, advised him that he might appeal to the United States Civil Service Commission, but that if he did, he could not obtain within the Department of the Army a review of the action separating him from the service, and that if he did elect to secure a redress of his grievances through the procedure of the Department of the Army, he would in all probability lose his right to appeal to the Civil Service Commission, since appeals to the Civil Service Commission had to be taken within 10 days from the effective date of the order of separation. Plaintiff elected to secure redress of his grievances through Army channels-, and after he had failed to secure redress there, he did not appeal to the Civil Service Commission, apparently believing that he could not do so since the time for the appeal had elapsed and because of the advice of his superiors in the Army that if he did undertake *204 to secure redress through Army procedure, this might preclude him from appealing to the Civil Service Commission.
Under those facts, we thought that plaintiff was to be excused for not having appealed to the Civil Service Commission and could come to this court, notwithstanding his failure to appeal.
The ordinary rule, however, is that stated in Martilla v. United States, 118 C. Cls. 177, in which we held that as a general rule an employee cannot come into court until after he has appealed to the Civil Service Commission, and that commission has finally acted on his case.
In the cases at bar, we see no excuse for the failure of plaintiffs to appeal to the Civil Service Commission. They say their superiors advised them not to do so because it would do them no good, and because they feared that if they did, their superiors would deprive them of overtime, give them unpleasant jobs, etc.; but the Commissioner has found, and we agree with his finding, that this fear was not the result of any reliably proven threats by plaintiffs’ superiors, nor supported by instances of reprisals against employees who did appeal.
Moreover, an appeal to the Civil Service Commission would no more have resulted in reprisals against the employees than would a suit in court. The cases simply boil down to this: the plaintiffs selected the wrong forum for. redress of their grievances. They should have gone first to the Civil Service Commission. They had no right to come here until after they had done so.
It results that the petitions of plaintiffs John B. Baker, William J. Bradshaw, William L. Campbell, Fred W. Gruber, Charles E. Kircher, Edward I. Kwitchoff, Alexander F. Manfredi, Clyde H. Pettit, Dickson Watson, Ernest E. Eosenstrom, Charles Simonson, Otto Ubell, John F. Schneider, Sidney J. Smith, Joseph Petrotta, John A. Adler, Michael Gelfat, Kobert E. Himwich, Henry Ilorr, Alfred M. Johnson, Frank Bom, and Isaac Sussman must be dismissed.
It is so ordered.
LaraMOke, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
*205 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. These four cases have been joined because of similarity of issues. To avoid undue repetition and at the same time provide the factual details from which certain major conclusions are drawn, the introductory findings 2 through 17 are a general recapitulation and appraisal of the evidence pertaining to all plaintiffs, while findings 18 through 110 are special findings applicable to each individual plaintiff.
2. Each plaintiff was, at the time of his demotion, a civilian employee of the New York Naval Shipyard, Brooklyn, New York (hereinafter “Shipyard”), occupying a supervisory position. Each plaintiff is a preference eligible as defined by the Veterans’ Preference Act of 1944, as amended. Each plaintiff at the time of his demotion held an efficiency rating of “good” or better.[1]
3. For functional purposes, the New York Naval Shipyard is divided into 18 or 20 different shops. The journeymen skilled in a particular trade or one allied thereto are assigned to one of several shops charged with carrying out assignments peculiar to that trade. The lowest grade supervisor in each shop is called a leadingman. Each leadingman supervises from 15 to 30 journeymen. The next step is the quarterman, who supervises two or three leadingmen. The larger shops have a chief quarterman and then a foreman for each shift. In charge of each shop is a master who is responsible for final decisions in the shop. Each shop also has a personnel supervisor.
4. Plaintiffs’ demotions in grade and salary took place for the most part during the latter half of 1947 and early in 1948.[2] Postwar reductions in the force of employees in *206 nonsupervisory positions (journeymen) had resulted in an excess number of supervisors, making it necessary to demote plaintiffs who held supervisory positions. Each plaintiff supervisor had previously been demoted either in 1946 or 1947, and had been restored without making an appeal to the Civil Service Commission. The restorations by the Navy Department in those earlier instances occurred as a-result of a ruling by the Commission in another contemporary case that the demotion of a comparable shipyard supervisor, demoted under similar circumstances, was procedurally improper.
5. The parties have stipulated with reference to the plaintiffs listed below that (1) each was demoted from his supervisory position as indicated to the next lower position as a result of a reduction in force of lower level employees resulting in a surplus of supervisors; (2) at least one competing nonveteran with lower retention rights was retained by the Navy Department in each plaintiff’s grade, and (3) plaintiffs did not appeal their demotions to the Civil Service-Commission :

Name Date of demotion Demoted from

John E. Baker_1/12/48 Quarterman Machinist
William J. Bradshaw_1/12/48 Leadingman Machinist
William L. Campbell_1/12/48 Leadingman Boilermaker
Fred W. Gruber_1/12/48 Leadingman Machinist
Charles E. Kircher_6/17/48 Leadingman Machinist
Edward I. KwitchofC_5/17/48 Leadingman Machinist
Alexander F. Manfredi_ 7/28/47 Quarterman Painter
Clyde H. Pettit_1/12/48 Quarterman Machinist
Dickson Watson_ 7/28/47 Leadingman Boatbuilder
Ernest E. Eosenstrom_1/12/48 Leadingman Machinist
Charles Simonson_ 7/28/47 Quarterman Machinist
Otto Ubell_ 7/28/47 Quarterman Machinist
John F. Schneider_1/12/48 Quarterman Coppersmith
Sidney J. Smith_5/17/48 Leadingman Machinist
Joseph Petrotta_5/3/48 Leadingman Welder
6. During the period following World War II, when the Shipyard was undergoing large reductions in force resulting in reductions in grades among the supervisors, a feeling of resentment developed on the part of the nonveteran employees against the preference eligibles primarily as a result of employment retention preferences guaranteed by the *207 Veterans’ Preference Act of 1944, as amended. The non-veterans formed an organization called the “Career Workers - Association” to discuss job protection rights of nonveterans - and attempted to resist the preferences guaranteed to vet- - erans by the Veterans’ Preference Act. The members: of the Association wore badges bearing the words “Second Class Citizens” as a public display of their feelings about the Veterans’Preference Act. The existence of this condition created an air of tension throughout the Shipyard.
7. Most of the top level supervisory force (masters, foremen, and chief quartermen) were nonveterans. These top-level supervisors were concerned over the effects of the-Veterans’ Preference Act, believing that in some ways it created injustices among the personnel and would interfere-with production in the Shipyard. The morale and feeling - of security of those employes entitled to veterans preference • suffered considerably as a result.
8. A few veterans who had been demoted in circumstances similar to those surrounding the demotions of the plaintiffs - reported herein filed appeals.[3] While there was some evidence that reprisals may have been inflicted upon those who had the temerity to appeal their demotions — reprisals in-the form of assignments to onerous or unpleasant details,. loss of overtime, frequent transfers to various jobs, tranfers • to assignments remote from one’s home so as to complicate - daily commuting, and the like — the evidence offered was too - speculative for reliance and the hardships inflicted may have - been due to other undisclosed causes. The top level super- - visors such as the master, foremen, and chief quartermen,. undoubtedly had the collective authority and power to make - working conditions unpleasant for their subordinates, but the evidence of their exercising this power to coerce the-plaintiffs into not appealing their demotions was not reliably • shown. The details of the alleged threats are set forth more - *208 specifically in the later findings dealing with the individual plaintiffs.
9. The Civil Service Commission denied the appeals taken in 1947 and 1948 by those of the supervisors who then appealed their demotions (not the plaintiffs herein). However, following the decision of the Circuit Court of Appeals in Reynolds v. Lovett, 201 F. 2d 181, certiorari denied sub nomine Wilson v. Reynolds, 345 U. S. 926, the Commission in 1953 amended its regulations to conform to the court’s holding, reopened and reconsidered previous appeals and ordered those veterans who had appealed to be restored to their former positions in the Shipyard.
10. Plaintiffs are skilled and experienced in their respective trades. Their formal education was limited, for the most part, to grammar school. The job comparisons which resulted in their demotions were accomplished by their respective masters, whose power to promote and reduce personnel, while not unlimited, was very broad, requiring only confirmation by their Shipyard superiors. Their authority was supreme in this respect at the shop level and, in the eyes of subordinates, the master was virtually omnipotent.
11. Each plaintiff was advised in writing at the time of his demotion of his right to appeal to the Civil Service Commission.
12. Most of the plaintiffs discussed the question of appealing with their superiors (masters, foremen, chief quarter-men, or quartermen) who advised against such action, stressing the futility of it and, in some cases, holding out to plaintiffs a prospect of restoration in the near future. Since within the preceding year plaintiffs had been restored after temporary demotions without taking formal appeals, it is reasonable to conclude that the prospect of restoration had a profound effect on their decisions not to appeal.
13. Plaintiffs chose not to appeal to the Civil Service Commission for the reasons stated above and because they were afraid that such action on their part would jeopardize their right to continue as employees at the Shipyard. Several were to reach the age for retirement within a few years. Others had large families to support. Some were afraid *209 that taking an appeal would result in curtailment of their normal overtime allotment, or even in complete loss of all overtime. The fear of reprisal was also constantly with plaintiffs and further motivated their decisions not to appeal. These assorted fears, while genuine to those plaintiffs entertaining them, were not supported by the evidence to be proximately consequential to any reliably proven threats by superiors or instances of reprisals against other nonconforming employees in the Shipyard. The economic situations of the plaintiffs, their dearth of comprehension of their rights, their awe of authority, all contributed in varying degrees to a paralysis of their capacity for self-assertion.
14. On July 22,1953, following the decision in the case of Reynolds v. Lovett, supra, most of the plaintiffs,[4] acting through their attorney, wrote to the Director, Second U. S. Civil Service Region, requesting a review of their demotions and directing the Commission’s attention to the Court of Appeals decision in Reynolds v. Lovett, supra.
15. By letter of August 17, 1953, the Regional Director of the Second Region replied advising that effective July 28, 1953, the Commission’s regulations governing appeals of preference eligibles under the Veterans’ Preference Act of 1944 was amended to entertain further appeals only under certain circumstances (5 CFR 22,11 (e) (2), 18 F. R. 4395). The Regional Director interpreted this amendment as follows:
Under the revised regulations, the Commission will consider further appeals where there is a record of a previous timely Section 14 appeal of such demotion to the Commission, except that an appeal which was previously declined under the provisions of Section 14 and the Commission’s regulations in Section 22.4 on the ground of delay in submission will not be reopened. Further, where there is no record of a previous timely appeal and it is not established by the evidence that there was an attempt to make such appeal within the time limits of the law and Section 22.4 of the Commission’s regulations pursuant thereto, the request for con *210 sideration will be declined since it is not a case of reopening an appeal.
16. In response to tbe Second Eegion’s letter of August 17,, 1953, plaintiffs, by letter dated November 24, 1953, transmitted representative affidavits outlining the circumstances, which prevented their pursuing administrative appeals in 1947 and 1948. In concluding their request for review* plaintiffs said:
As a result of the far-reaching and extensive reduction in force programs, conditions in the New _ York Naval Shipyard were very unsettled during the year 1947, and the employees of the Shipyard were more concerned with continuing as employees than retaining any particular rank. Threats of complete discharge rang through the ranks and the fear of reprisals was acute. Scuttlebutt was fed by certain of the higher supervisory echelons that appeals were useless and retaliatory action was almost certain to be taken. There was, therefore, no uniform appeal. The affidavits attached hereto indicate the reasons why, in 1947 and 1948, these and other employees felt it inadvisable to appeal to your office. Conditions have now changed.. Therefore, in view of your discretionary authority under Section 22.4 of Chapter Z-l of the Federal Personnel Manual, each appellant requests that you now review his demotion and examine the registers which were improperly compiled at the time of the adverse agency action.
17. The Second Eegion advised plaintiffs by letter dated' December 2,1953, that the requests and affidavits transmitted by letter of November 24, 1953, were being forwarded to. the Commission’s Board of Appeals and Eeview for further-consideration. By letter of July 16, 1954, the Board of Appeals and Eeview decided that no basis was found in the-additional material presented by plaintiffs for holding that their failure to file timely appeals was due to circumstances! beyond their control. In so holding, the Board said: :
According to the information submitted by or in behalf of the 23 listed employees, various attempts were made by some of them to appeal their demotions within the employing agency, although apparently all were aware of their right to appeal to the Civil Service Commission. It is further indicated that they ref rained from *211 pursuing this right because of alleged fear of future reprisal in connection with their employment. Irrespective of the particular Eegulation under which these cases have been considered, alleged fear of reprisal is not regarded as a condition which necessarily prevents the filing of a timely appeal. In the instant cases the employees made their own decision not to exercise their appeal rights, and the only occasion for their present rer quest is their having learned of a Court decision issued many months, and in some of the cases years, after their original abandonment of their appeal rights.
JoiiN A. Adler
(Plaintiff No. 1 in Adler petition)
18. Plaintiff John A. Adler, a preference eligible, was •employed at the Shipyard at time of trial as a fourth class machinist. He was first employed by the Shipyard as a machinist in 1920, reduced in force in 1923, and returned in 1934 as a machinist.
19. In 1943 he was made a machinist instructor and held this position on permanent status until December 10, 1945, when he was reduced to machinist first class. Effective November 5, 1951, Adler once again was made machinist instructor, an additional pay assignment ($16.24 per day), from machinist third step ($15.76 per day). He served in in the grade of machinist instructor third step until June 16, 1952, when he became eligible for advancement to the fourth step. Since the Shipyard system of gradation at that time made no provision for a fourth step pay increase for the grade of machinist instructor, Adler was reassigned as machinist fourth step, effective June 16, 1952, in order to gain advantage of the administrative pay increase of 64 cents per day.
20. However, effective July 10,1952, machinist instructors were given a 15 cents per hour pay increase by order of the Commander, New York Naval Shipyard. Adler’s grade designation was once again changed, effective July 21, 1952, to machinist instructor to give him the benefit of the pay increase to $18.08 per day.
21. On August 6, 1952, Adler was notified that, effective August 11,1952, his additional pay assignment as machinist *212 instructor, at $18.08 per day, would be terminated and be would be reassigned as machinist fourth step, at $16.88 per day. Section 5 of Navy Civilian Personnel Instructions, dated July 27, 1951, reflecting an agreement between the Navy Department and the Civil Service Commission, provided that the Veterans Preference Act would not apply to assignments of under 121 calendar days to a series of enumerated employments, among which was that of instructor. The evidence does not disclose the authority for the instruction in question, or for the Navy’s agreement with the Civil Service Commission.
22. At the time he received the notification of his reduction to machinist fourth step, in August 1952, Adler was told by his quarterman that all the instructors were being reduced and it would do no good to appeal. Thereupon Adler chose not to appeal his demotion to the Civil Service Commission, and did not do so.
23. On July 19,1954, the Board of Appeals and Review of the Civil Service Commission denied Adler’s request of November 24, 1953, for a review of his reduction of August 1952. The grounds of the denial were that Adler had failed to file a timely appeal.
JOHN R. BAKER
(Plaintiff No. 3 in Adler petition)
24. Plaintiff John R. Baker, a preference eligible, retired on December 31, 1954, after 40 years as a machinist in the Shipyard. He had a grammar school education and served seven years as a quarterman machinist prior to demotion to leadingman machinist on January 12,1948.
25. A few days after his demotion in 1948 Baker discussed the possibility of taking an appeal with his then immediate supervisor, quarterman Charles ■ Testut, a nonveteran. Testut told Baker: “I don’t know whether you will have anything to be gained by going down and appealing your case.”
26. At about the same time Baker’s personnel supervisor, a nonveteran, asked Baker to relinquish his rating as quarter-man and become a journeyman where he would have no supervisory functions, since to remain as a supervisor would be detrimental to his health.
*213 27. Some veterans in Baker’s shop who appealed their demotions were thereafter shipped from job to job, some of the assignments being of an undesirable nature, but the evidence is not adequate to establish these as reprisal measures taken by the shop superiors. At the time of his demotion Baker lacked five years’ service of qualifying for full retirement annuity.
28. Baker’s election not to appeal his demotion was voluntary, motivated by self-persuaded fear of losing his job and risking his chances for full retirement, advice from his superiors, and the potential detriment to his health if he were given work assignments of an undesirable nature.
WILLIAM J. BRADSHAW
(Plaintiff No. 5 in Adler petition)
29. Plaintiff William J. Bradshaw is a preference eligible and had served 13 years in the Shipyard prior to demotion to machinist from leadingman machinist on January 12, 1948.
30. At the time of his demotion he had the impression that Shipyard officials did not wish demoted veterans to appeal and that it would be better for all concerned and “for the good of the service” if he accepted his demotion without protest. He testified that a feeling prevailed among veterans that taking an appeal was “like hitting your head against a stone wall.” Because of the existing conditions, Bradshaw did not choose to take what then appeared to him to be the foolish risk of appealing and perhaps thereby prejudicing his opportunity for future promotion.
WILLIAM L. CAMPBELL
(Plaintiff No. 6 in Adler petition)
31. Plaintiff William L. Campbell, a preference eligible, had been an employee in the Shipyard for 19 years as plumber and boilermaker. He had an eighth grade education and, at the time of his demotion on January 12, 1948, from leadingman boilermaker to boilermaker, he was approaching retirement.
*214 32. Campbell testified that, at the time of his demotion, the master of his shop asked him to sign a waiver of his right to appeal (which he did not sign), but the evidence does not substantiate this to be the fact.[5] At the' same time the master told Campbell that he would try to get Campbell’s supervisory job restored to him later when things settled down, and that he did not think it would do much good to appeal. Campbell was also informed by the master that those who appealed would “have a hard job on their hands” which, rightly or wrongly, Campbell interpreted to mean that those who appealed would be given unpleasant work assignments in reprisal.
33. Campbell’s election not to appeal his demotion in 1948 was voluntary, motivated by self-instilled fear of jeopardizing his job or being given undesirable work assignments, faulty but not vindictive advice from his master, and personal belief that he would be restored to his former position when conditions permitted.
MICHAEL GELEAT
(Plaintiff No. 15 in Adler petition)
34. Plaintiff Michael Gelfat, a preference eligible, was employed at the Shipyard at time of trial as Engineering Aid, CAF-5. He was first employed by the Shipyard in January 1942, as a junior storekeeper, and in 1943 was promoted to assistant storekeeper.
35. After a tour of military duty, he returned to the Shipyard in 1946 as traffic clerk. In this capacity he had complete charge of receiving at the South Brooklyn Annex, a subdivision of the supply department of the Shipyard, and directly supervised 11 storekeepers, 8 clerks, and 32 checkers. *215 He was responsible for checking the property receiving activities on two piers and a few warehouses, as well as being responsible for assignment of checkers and preparation of their efficiency ratings. He remained as supervisor at the South Brooklyn Annex for approximately nine months until the Annex was closed in 1946 under a decommissioning program.
36. He was transferred back to the Shipyard in 1946 in his same grade but was assigned the duties of a checker picking up materials with no supervisory authority whatsoever. Later he was assigned to receive materials in the receiving office but still without any supervisory functions.
37. In 1949 Gelfat was requested to write a position description of the duties he was performing at that time. He was notified on August 8, 1949, of the proposed action to change the allocation of his position from Traffic Clerk, CAF-5, $3,351 per annum, to Storekeeper’ (Keceiving), CAF — 4, $3,175.44 per annum, as the result of a classification survey of the supply department. The notice informed him of his right under the Veterans’ Preference Act of' 1944 to answer and to request a formal hearing, and advised that the reduction was to promote the efficiency of the service and did not involve a reduction in force. He failed to reply orally, or in writing, and did not request a formal hearing. He was notified on September 6, 1949, of the adverse decision, and advised of his right to appeal to the United States Civil Service Commission. The proposed action was made effective September 18,1949.
38. By letter of September 8, 1949, Gelfat appealed the downward allocation of his position to the Second Civil Service Begion. Effective September 18, 1949, he was reduced from Traffic Clerk, GS-5 to Storekeeper, GS-4. This was the first time the change in his supervisory functions as a result of his transfer from the South Brooklyn Annex resulted in any decrease in pay.
39. A few days after the filing of his appeal, Gelfat was interviewed by an investigator from the Civil Service Commission. The purpose of the interview was to obtain an affidavit from Gelfat stating the facts upon which the appeal was based. Such interviews were standard operating pro *216 cedure. Following the interview Gelfat signed the following affidavit, composed by the investigator, withdrawing his appeal:
I desire to withdraw the appeal which I filed with the U. S. Civil Service Commission protesting the allocation of my position from Traffic Clerk, CAF-5 to Storekeeper CAF-4. I filed said appeal under the provisions of Section 14 of the Veterans Preference Act of 1944.
I understand my rights under Section 14 of the Veterans Preference Act of 1944 and I am making this statement of my own free will without threat, coercion or promise of reward.
I have read the foregoing statement consisting of two (2) pages, fully understand same and find it to be true and complete to the best of my knowledge and belief.
40. Although Gelfat testified that the investigator had misrepresented the nature of the foregoing affidavit (which Gelfat apparently signed without reading) to be merely a certificate that he had been interviewed and understood his rights, and that the investigator had represented to him that it was management’s prerogative to assign him to any job and that it would be hopeless to continue his appeal, the evidence does not establish that the affidavit was induced through coercion or misrepresentation or that it was not a free and voluntary act. Nor does the evidence disclose the precise reason for execution of the affidavit by Gelfat.[6]
41. On September 23,1949, the Commission advised Gelfat in writing that no further action would be taken on his appeal in view of the affidavit withdrawing it. The evidence contains no reply or protests by Gelfat and no record of any subsequent attempts by him to ascertain the status of his appeal.
ERED W. GRTJBER
(Plaintiff No. 16 in Adler petition)
42. Plaintiff Fred ~W. Gruber, a preference eligible, retired on June 30, 1952, after having completed 25 years of service as a machinist in the Shipyard. His formal education *217 consisted of grammar school plus some night school work at the high school level. On January 12, 1948, he was demoted from leadingman machinist to machinist.
43. When he received his notice of demotion he did not appeal and did not discuss the question of appealing with his superiors because he was afraid of retaliations and did not want to jeopardize his retirement prospects. His fear was not based upon anything told him by his superiors, but upon his personal feelings as to the unpopularity of the veterans in the Shipyard during the reduction program, his ■claimed knowledge of two other demoted supervisors who had been shifted around from job to job and given unpleasant assignments after they had appealed, and his belief that his superiors kept for purposes of harassment a record of those ■employees who exhibited undue independence. When asked at trial as to whether it was not normal procedure for Shipyard employees to be given frequent changes of assignment not as a reprisal measure, Gruber’s following response reveals an attitude of mind which typified many employees similarly situated:
They can do a lot of things to you down there and tell you it was the normal thing to do. That is what they will do; they will take me and push me some place, and they will say, “Well, Gruber has been a good man all these years; he has worked in such and such work,” and now they will say they don’t like me for some reason and they are going to push me out of this job here, and I will say to them — well, what can I say? I go before the Board and say something, and they say, “Well, we needed a man on this job and you were the logical man to do it”, and then what can I say ? Sure, I was, but ordinarily I wouldn’t be assigned to that kind of a job.
ROBERT E. HIMWTCH
(Plaintiff No. 19 in Adler petition)
44. Plaintiff Robert E. Himwich, a preference eligible, was employed at the Shipyard at time of trial as Traffic •Clerk, GS-4. He had been an employee in the Shipyard since 1941, beginning there in the grade of Junior Storekeeper, GS-2, and advancing to the grade of Traffic Clerk, CAE-6, in December 1944.
*218 45. In the position of Traffic Clerk, CAF-6, Himwich had direct supervision over more than 20 laborers and about seven classified employees. He was in charge of the car and lighterage section in an assignment comparable to that of a traffic agent in the field of commercial transportation.
46. In 1947 the Shipyard began to gradually curtail Him-wich’s supervisory activities due to a general reorganization made necessary by a reduction of workload at the Shipyard. Laborers who had previously been under his supervision were reduced in force or assigned elsewhere. His duties were transferred to other departments, his office torn down, and his original department consolidated with another section. This reduction in duties and supervisory functions continued until, in 1949, Himwich was charged with the supervision of only two or three checkers drawn from a labor pool as needed.
47. Early in 1949, Himwich was requested to and did prepare a position description of the duties he was performing at that time. Based upon this description his position was reevaluated and allocated as Traffic Clerk, CAF-4. The determination of grade by the position classifier was based in large measure upon the degree of supervision which Himwich exercised.
48. On August 8, 1949, Himwich was notified of his proposed demotion from grade CAF-6 to CAF-4, effective not less than 30 days thence, as a result of a classification survey made in the supply department. On September 18, 1949, he was reduced to CAF-4. This was the first date on which the decrease in his supervisory functions and substantial change in his duties resulted in any decrease in pay. At no time prior to August 8, 1949, was Himwich advised either orally or in writing of any proposal to remove subordinates from his supervision or to substantially change his duties.
49. He appealed his change to a lower grade to the Second Kegional Office of the United States Civil Service Commission and, in an affidavit submitted in support of his appeal, he stated in part: ■
I am appealing the aforementioned downgrading action under the provision of Section 14 of the Veterans’ Preference Act of 1944. I feel that said action was unfair and highly unjust. It is my contention that my *219 position has been improperly allocated at the CAF-4 level. I contend that the duties and responsibilities of my position are such that the job should be properly classified and allocated at grade CAF-6 or at least a minimum of Grade, CAF-5.
I have read position description No. S-32159, and find that said description reflects the duties and responsibilities of my position. However, I feel .that sufficient weight has not been given to the responsibilities of my position to the value of my knowledge of various railroad tariffs and regulations.
My duties and responsibilities are the- same now as they were prior to the downgrading action.
I feel that a desk audit of my position is necessary in order that full evaluation of the duties and responsibilities of my position can be accomplished.
I have no further information to submit to the Commission in this matter.
I do not contend that I have been discriminated against in this action, which downgraded me to CAF-4, in any manner whatsoever.
He was given a hearing by the Kegional Office and the action of the Shipyard was sustained on October 13, 1944. He appealed to the Commission’s Board of Appeals and Keview which affirmed the Second Region’s decision. There is no evidence that a request for reconsideration was filed with the Commission. His sole contention in the course of the appeal was that his downgrading to Traffic Clerk, CAF-4, resulted from an erroneous classification of his position.
HENRY HORR
(Plaintiff No. 20 in Adler petition)
50. Plaintiff Henry Horr was employed at time of trial in the Power Plant Division of the Public Works Shop at the Shipyard as a leadingman electrician.
51. He began his employment with the Shipyard in 1936 as a third class electrician in the electrical shop. In 1938 he was transferred to the power plant (03 shop) in the capacity of maintenance man and operator of electrical equipment for the power plant. He was promoted to leading-man power plant mechanic in 1942, and in May 1944 he was promoted to quarterman, electric power plant. There were two titles in the power plant, mechanic and electrician. The *220 titles meant little since many of the duties in 1948 were interchangeable, and the difference between the respective functions of the positions was very small.
52. On April 19, 1948, Horr was demoted from quarter-man electrician to leadingman electrician in shop 03, power plant, as a result of a reduction in force of lower level employees. He was the only quarterman electrician in the shop. At the time of the demotion a competing nonveteran, John T. Tierney, was retained as a quarterman mechanic in the same shop. Tierney had been a leadingman or quarterman mechanic in shop 03 since 1942. During the period prior to Horr’s demotion, the quarterman duties in the power plant were divided between Tierney and Horr, with Tierney performing the inside mechanical and office work, and Horr performing the outside work on the mechanical and electrical distribution systems. Horr has continued to perform the stated mechanic duties and the duties of quarterman electrician since his demotion, although rated leadingman electrician.
53. There were also quartermen electricians in the material laboratory (09 shop) and the electrical shop in April 1948. Because the duties of an electrician attached to the power plant are of a higher standard than those in the other-shops, an electrician in the power plant could readily handle the work of one in the electrical shop although the reverse might not be true.
54. Upon receipt of the notice of his demotion and right to appeal, Horr told his master that he was considering taking an appeal, to which the master replied: “You would be foolish, if you did, because I will be still your boss.” Horr also was advised by his personnel supervisor not to appeal, and was told that he would be restored to his former grade as soon as Tierney retired.
55. Horr’s election not to appeal his demotion was voluntary, motivated by the advice of his superiors, hope that he would be reinstated without appealing, and fear of courting the displeasure of his superiors, the last being based upon his asserted knowledge of instances where the master had harassed employees who had come into his disfavor.
56. There is no evidence in the record (beyond what is *221 reported above) that Horr had retention rights superior to any other employee in any applicable competitive level.
ALFRED At. JOHNSON
(Plaintiff No. 21 in Adler petition)
57. Plaintiff Alfred M. Johnson, a preference eligible, was first employed by the Shipyard in 1940 as a junior storekeeper. From 1943 to 1945 he was in military service and, soon after his return to work in the Shipyard in 1945, he was placed in charge of the night shift in Building 8 with the grade of Traffic Clerk, CAF-5. In this capacity he supervised 37 per annum employees, the majority of whom held grade CAF-4.
58. Johnson remained as supervisor in charge of the night shift until 1947 when he was notified verbally to report to the day shift. Upon reporting to the day shift he was detailed to receiving decommissioned materials, accomplishing bills of lading and disposing of the decommissioned material either to War Assets Administration or General Supply.[7] These duties entailed no supervisory responsibility.
59. In February 1949, in the course of a classification survey, Johnson was requested to and did write a position description of the duties he was performing on the day shift at that time. With this position description as a basis, the duties and responsibilities of Johnson’s position were analyzed and then evaluated by the Area Wage and Classification Office as allocable to the grade of storekeeper.
60. On August 8, 1949, he was notified in writing of this determination and of the resulting downgrading to become effective not less than 30 days later, and was adviséd therein of his rights as a veteran, including his right to a hearing. No reply was made to the notification of the proposed change to a lower grade and no request was made for a foi'mal hearing. On September 6, 1949, he was notified that the proposed reduction would be effective on September 18, and was advised of his right to appeal to the Regional Director of the Civil Service Commission. On September 18, 1949, he *222 ■was demoted from Traffic Clerk, CAF-5 to Storekeeper, CAF-3, with a resulting decrease in pay. This was the first date on which the change in Johnson’s duties and supervisory responsibilities had resulted in a change in his pay status.
61. He did not appeal his demotion to the Civil Service ' Commission. He did, however, discuss the reduction with his immediate supervisor who, when asked about appealing, advised (Johnson’s paraphrase): “Well, you would be butting your head against a stone wall. It is management’s decision to reduce you.” His supervisor further advised Johnson that the demotion was probably temporary and it would be adjusted eventually with Johnson being promoted to grade 4. J ohnson was also friendly with plaintiff Gelf at and was informed of Gelfat’s discussion with the Civil Service'investigation as outlined in findings 34 through 41. As a result of these discussions Johnson chose not to appeal. There is no evidence that he chose not to appeal as a result .of undue influence.
62. Subsequent to 1949 Johnson was promoted to the grade of Storekeeper, GS-4, a position which he held at the time of trial.
CHARLES B. KIRCHER
(Plaintiff No. 22 in Adler petition)
63. Plaintiff Charles B. Kircher, a preference eligible, was employed in the Shipyard at the time of trial as a shipbuilding inspector. He had been an employee in the Shipyard since 1940 and served as a leadingman for five years prior to 1948.
64. On November 18,1946, Kircher was reduced from lead-ingman machinist to machinist, and was restored to the former on May 5,1947. On May 17,1948, he was again reduced to machinist, which action he did not appeal.
65. At about the time of his reduction in 1948 Kircher dis-cusséd the question of appeal with his assistant personnel supervisor who advised that chances of success on. appeal were “pretty slim” and if no appeal were taken, Kircher would be one of the first to be restored as supervisor. Kircher sought the advice of his quarterman who was his *223 immediate supervisor, who also advised him not to appeal. His superiors did not threaten him with undesirable assignments or pay reductions if he appealed. At the time of his demotion in 1948 Kircher had ten children to support. A definite air of tension between nonveterans and veterans existed in the Shipyard.
66. Kircher’s election not to appeal his demotion in 1948 was voluntary, motivated not by coercion or undue influence of his superiors, but by the advice they had given him and the consequent feeling that his restoration was simply a matter of time (as it had been on the prior occasion) and might be jeopardized by his taking an appeal.
EDWARD I. KWITCHOFF
(Plaintiff No. 23 in Adler petition)
67. Plaintiff Edward I. Kwitchoff, a preference eligible, was employed in the Shipyard at time of trial as a leading-man machinist, having been promoted to this grade on March 17, 1952. Pie had been employed by the Shipyard since 1936.
68. Prior to his demotion from leadingman machinist to machinist on May 17,1948, Kwitchoff’s duties involved office work and he was in constant close contact with the master of the shop. As a result, he overheard many conversations with and comments by the master in connection with appeals by various unnamed demotees and had an opportunity to observe ait first hand the master’s attitude toward veterans who indicated they would appeal. The master resented those who filed appeals.
69. A few days after receiving his demotion notice, Kwitch-off, who was quite friendly with the master, sought the latter’s advice about appealing his demotion. The master said he would not recommend appealing and that it would be against Kwitchoff’s best interests. Kwitchoff also spoke to the assistant personnel supervisor who advised against taking an appeal.
70. Asa result of the foregoing advice from both the master and assistant personnel supervisor, and from the many conversations he had overheard, Kwitchoff felt it would be to his disadvantage to appeal his demotion, and so did not.
*224 ALEXANDER F. MANFREDI
(Plaintiff No. 28 in Adler petition)
71. Plaintiff Alexander F. Manfredi, a preference eligible, was employed in tbe Shipyard at time of trial as a leading-man painter. He had been employed theretofore by the Shipyard for 19 years. He completed grammar school and attended evening high school.
72. On March 17,1947, Manfredi was demoted from quar-terman painter to leadingman painter and restored to the former rank on May 5,1947, without taking an appeal. On July 28,1947, he was again demoted to leadingman painter.
73. Although he was aware of his rights, plaintiff did not appeal or discuss the question of appeal with his superiors because he felt that the Shipyard sentiment against veterans was so prevalent, and his master, a nonveteran, was so stubborn and unapproachable a person, he might jeopardize his job or draw unpleasant assignments by appealing. He had not been told by his superiors that he should not take an appeal, but he was personally aware of the fact that his superiors were in a position to discharge or inflict unpleasant assignments upon those who appealed.
CLYDE H. PETTIT
(Plaintiff No. 30 in Adler petition)
74. Plaintiff Clyde H. Pettit, a preference eligible, was employed in the Shipyard at time of trial as a quarterman machinist, having been promoted to that grade on January 7, 1952. He had a high school education and had 31 years’ service in the Shipyard. He had served as a quarterman machinist for four years prior to his demotion to leadingman machinist on January 12, 1948. He did not appeal his demotion.
75. Pettit feared that if he did appeal his demotion he would jeopardize his right to a share of allocable overtime and endanger his employment in the Shipyard. His quar-terman and foreman, who controlled and approved overtime for . employees, were both nonveterans, and he had the impression that veterans were unpopular with the nonveteran *225 supervisors. Pettit bad seen, tbe treatment accorded others, who had appealed their demotions and the unpleasant assignments and constant shifting from job to job following; their appeals. These impressions of Pettit were generalized' and subjective, and not of evidentiary quality. He did not discuss the subject of appeal with his superiors, nor did they-threaten him with reprisals if he appealed.
DICKSON WATSON
(Plaintiff No. 37 in Adler petition)
76. Plaintiff Dickson Watson, a preference eligible, was-, employed in the Shipyard at time of trial as a boatbuilder... He had spent his life in the boatbuilding trade and had.been, employed by the Shipyard for over 32 years.
77. On November 18,1946, Watson was demoted from lead--ingman boatbuilder to boatbuilder and was restored to the-former rank on May 5,1947, by action of the Shipyard with-out appeal on his part. On July 28, 1947, he was again demoted to boatbuilder, and filed no appeal to this action, nor did he discuss the subject of appeal with his superiors.
78. The election not to appeal was voluntary on the part of plaintiff, motivated by his fear of prejudicing his chances for future promotion, based not upon any threats of reprisals. by his superiors, but upon his impression that veterans were unpopular in the Shipyard and his awareness of the power-his superiors had to assign to unpleasant jobs those who incurred their displeasure. However, he knew of no specific instances of reprisals taken out by his superiors against', others who appealed their demotions.
¡FRANK ROM
(Plaintiff No. 8 in Borriello petition)
79. Plaintiff Frank Horn, a preference eligible, was employed at the Shipyard at time of trial in 07 shop as a pipe-fitter. He had a grammar school education, had practiced, the plumbing trade since 1910, and had served in the Shipyard as a plumber since 1940. Pipefitting is part of the-plumbing trade.
*226 80. On July 28, 1947, Eom was reduced from leadingman pipefitter to pipefitter as a result of a reduction in force of lower level employees. Eom was working in shop 07 at the time of his demotion and was listed on the 07 retention register in retention subgroup A-l. During this demotion, how* ever, seven employees listed on the retention register of shop 56 as being in retention subgroup A-2 were retained as lead-ingman pipefitters. No employee with lower retention credits than Eom was retained at the leadingman pipefitter level in shop 07.
81. Shop 56 and shop 07 performed the same type of work except that shop 56 assignments were performed on a ship, while shop 07 assignments were not. Eom was qualified to perform the duties of leadingman pipefitter in either shop 07 or shop 56, which latter also employed leadingman pipe-fitters. The j obs were interchangeable and at least one supervisor had in the past been transferred from one plumbing shop to another.
82. Eom was advised of his right to appeal his demotion to the Civil Service Commission but did not do so.
83. He discussed the question of appealing with his chief quarterman, a nonveteran, and was informed that there were no further openings in shop 07 for supervisors and that the orders for the reduction had come from the Civil Service Commission. It was the chief quarterman’s advice that an appeal would result in Eom’s transfer to shop 03. From his experience of a previous demotion and transfer to shop' 03, Eom had reason to believe that there was no chance for him to regain his supervisor’s rating in shop 03 if this transfer took place.
84. Because of the advice of his supervisor against appealing and because taking an appeal might imperil his chances for future promotion, Eom elected not to.appeal to the Civil Service Commission. Eom’s decision not to appeal was voluntary and was based more on his belief in the futility of such action rather than on fear of reprisals.
*227 ERNEST E. EOSENSTROM:
(Plaintiff No. 9 in Borriello petition)
85. Plaintiff Ernest E. Eosenstrom, a preference eligible, was employed at the Shipyard at time of trial as an inspector and layout man, machinist, having been promoted to that assignment in 1951. He had a grammar school education and 45 years’ experience in machine shop work. He had been an employee in the Shipyard since 1934.
86. At the time of his demotion on January 12,1948, from leadingman machinist to machinist, Eosenstrom was approaching retirement age and was of the opinion that an appeal would jeopardize his job and his eventual retirement annuity. He had been on night duty for 18 years, so his household and living routine were adjusted to nightwork, which he liked, and he feared an appeal might result in his assignment to daytime work, as well as loss of overtime.
87. In Eosenstrom’s shop (No. 31) there was some sentiment against preference eligibles. The foreman was a non-veteran. Eosenstrom testified that several veterans who did elect to appeal were rapidly transferred from one job to another without permanent assignment, although the evidence does not necessarily establish a causal relationship in these instances. Eosenstrom believed the same treatment would be accorded him and this directly affected his decision not to appeal.
88. Because of his age, fear of transfer from nightwork and loss of overtime, Eosenstrom chose not to appeal his demotion in 1948. He had not discussed the matter with his superiors in electing not to appeal, and had not received from them directly or indirectly threats of reprisals should he appeal.
CHARLES SIMONSON
(Plaintiff No. 10 in Borriello petition)
89. Plaintiff Charles Simonson, a preference eligible, retired in July 1953, after serving over 13 years as a machinist in the Shipyard. He had a grammar school education and 50 years’ experience as a marine machinist.
*228 90. On July 28,1947, Simonson was reduced from quarter-man machinist to leadingman machinist. After receiving-the notification of his proposed demotion, he discussed the question of taking an appeal with the master of his shop,, who advised that the demotion was the ruling of the Civil Service Commission, that it would do no good to appeal the case at that time and it might result in more harm than good. The master also indicated to Simonson that as soon as the workload permitted restorations to grade, Simonson would be restored to his former grade. Such a restoration never occurred. Simonson was friendly with his master and felt he could rely upon his advice. Most of his superiors were nonveterans.
91. After his conversation with the master in 1947, Simon-son felt more secure in his job by not taking an appeal. He had no fear that reprisals would be taken against him if he appealed, and knew of no instances where those who-appealed had suffered harmful consequences. His failure to appeal was primarily because he thought it would be fruitless.
ISAAC SUSSMAN
(Plaintiff No. 12 in Borriello petition)
92. Plaintiff Sussman, a preference eligible, retired from active employment at the Shipyard in November 1954. He held the grade of helper sheetmetal worker immediately prior to his retirement. He had a grammar school education, was over 60 years of age at time of trial, and had been employed by the Shipyard for over 12 years.
93. Sussman had worked all his life in the sheetmetal trade. He first came to work in the Shipyard in 1940 as a sheet-metal worker and left in 1946 through a reduction in force.
94. In May 1948, while privately employed, he was called by the Shipyard and asked to return to work in the grade of sheetmetal worker. He did return to the Shipyard and was reinstated in that grade on May 3, 1948.
95. Under date of May 4, 1948, he executed the following statement:
*229 4 Mat 1948 alw
From: Isaac Sussman, Sheetmetal Worker, Check No. 17-13698. _
_ To: Industrial Relations Officer.
Subj: Change to Lower Grade and Waiver of Thirty Day Notice.
1. I was employed at this Shipyard as a Sheetmetal Worker, Intermediate, on 30 April 1945. Despite the fact that I formerly held this rating in the Shipyard, I am not qualified to do installation work aboard ships and cannot accept such an assignment.
2. Accordingly, I respectfully request to be permitted to accept a position as Helper Sheetmetal Worker, Maximum, since I am qualified for that rating and occupied such a position from 1941 to 1944.
3. I am making the foregoing request voluntarily and solely because of my inability to perform all the duties of the Sheetmetal Worker rating. It is understood that my demotion will become effective 10 May 1948.
(S) Isaac Sussman
Isaac Sussman, 17-13698
Sworn to and subscribed before me this 4th day of May 1948.
(S) Dermot P. Dunne
DeRmot P. Dunne
Personnel Administrator (General) CAF-10 New York Naval Shipyard, Brooklyn, N. Y.
Authority Granted by Act of Congress 26 June 1943.
Sussman did not compose the foregoing statement nor, at time of trial, did he recall ever seeing or signing the statement although he admitted it could be his signature. He denied ever requesting or consenting to a demotion or waiving his right to notice thereof. The witness to the foregoing written statement was not produced as a witness at the trial. While Sussman’s mentally confused demeanor at trial would lend plausibility to his lack of comprehension at that time, the evidence does not establish a similar lack of •comprehension in May 1948. Nor does the evidence establish that he did not subscribe to the instrument in question in 1948 with adequate knowledge of its import.
96. On May 5, 1948, two days after his return to duty, Sussman was demoted to helper sheetmetal worker, effective *230 May 10, 1948. The notification of personnel action dated May 5, under “Remarks,” stated:
1. In accordance with your written request dated 4 May 1948 you are hereby being changed to lower grade from Sheetmetal Worker Intermediate to Helper Sheet-metal Worker, Max.
2. Under the Veteran’s Preference Act, you would ordinarily be given 30 days in a work status prior to such change. However since you waive this 30 days notice period, this change to lower grade will become effective on the date shown in item 3 above.
Sussman testified, without contradiction, that he was given no notice, either verbally or in writing, of his right to appeal to the Civil Service Commission.
OTTO UBELL
(Plaintiff No. 14 in Borriello petition)
97. Plaintiff Otto Ubell, a preference eligible, was employed at time of trial as a leadingman machinist at the Shipyard. Pie had been an employee in the Shipyard for over 13 years.
98. On July 28,1947, Ubell was demoted from quarterman machinist to leadingman machinist. About a week after receipt of the notice of his proposed demotion in 1947, Ubell conferred with the master[8] of his shop about appealing the action to the Civil Service Commission. Ubell sought to obtain the master’s approval for such action, because he felt it proper to have the approval of the supervisor in charge of his shop before taking such a step. The master informed Ubell (according to Ubell’s uncontradicted testimony) that he wanted no trouble from any veteran, and if Ubell did cause trouble by appealing, the result of such action would be less overtime and assignments designed to effect his removal from his job and separation from employment in the Shipyard. The master further advised Ubell that when the opportunity presented itself for promotion to quarterman, he would be reinstated.
*231 99. The attitude towards veterans in the Shipyard was so hostile in 1947 that Ubell resigned from his veterans organization and removed his honorable discharge button in order to avoid trouble.
100. As a result of the advice from his master and the prospect of reinstatement, Ubell did not take an appeal.
JOHN F. SCHNEIDER
(Plaintiff No. 3 in Johnson petition)
101. Plaintiff Schneider, a preference eligible, was employed at the Shipyard at time of trial as a leadingman coppersmith. He had been employed in the Shipyard since March 7,1939.
102. On January 12, 1948, Schneider was demoted from quarterman coppersmith to leadingman coppersmith. When he was given his notification of demotion his master asked (according to Schneider’s testimony) if he had any objection to being demoted in place of two nonveteran supervisors and, after Schneider said that he did, the master told him in very strong terms of the reasons underlying the demotion and the poor prospects of appeal.
103. Schneider did not appeal. He believed that an appeal would not be beneficial and would result in the addition of his name to a shop “blacklist.”
SIDNEY J. SMITH
(Plaintiff No. 4 in Johnson petition)
104. Plaintiff Smith, a preference eligible, was employed in the Shipyard at time of trial as planner and estimator, machinist, marine, having been promoted to that position on March 1, 1952. He had been employed by the Shipyard for over 18 years. He had served as leadingman for several years prior to his demotion to journeyman on May 17, 1948.
105. According to Smith’s uncontradicted testimony, when he received his notice of demotion he was called into the office by his master, a nonveteran, and advised not to appeal, that in a month or two he would be restored to his former grade as leadingman. It was Smith’s feeling that if he did press an appeal he would be blacklisted, given unpleasant details, and *232 assigned to undesirable shifts, although this feeling was the product of his personal views and not of statements to him hy his superiors.
106. In 1941 Smith had been demoted for a period of six -months but was restored by action of the Navy without his having to take an appeal. The master of his shop held full ^authority in 1948 to promote a journeyman to leadingman. For these reasons, plaintiff had full confidence in his master’s statement that restoration to leadingman would follow in several months and did not, therefore, wish to jeopardize this -opportunity by appealing.
JOSEPH PETROTTA
(Plaintiff No. 5 in Goldblatt petition)
107. Plaintiff Petrotta, a preference eligible, was employed at the Shipyard at time of trial as a welder, gas, maximum. He had a grammar school education, 38 years’ experience in the welding trade, and 19y2 years’ employment in the Shipyard. He had served as a leadingman for six years prior to his demotion in 1948.
108. On May 3,1948, Petrotta was demoted from leading-man welder to welder maximum. According to his uncon-tradicted testimony, when he was advised of his demotion Petrotta was told by the master of his shop (No. 26) that the demotion was caused by a reorganization, but that in July conditions might be such as to permit Petrotta’s case to be reviewed to see what could be done for him. This Petrotta understood to mean that he would have a chance for promotion again in July. Petrotta had been reinstated once before in 1947 following a previous demotion in 1946.
109. Petrotta refrained from filing an appeal because, following the advice given him by his master, he concluded that it would be better to wait to see if he was restored, instead of filing an appeal which he felt might jeopardize his chances of restoration.
110. Plaintiffs in the Adler case, No. 226-53, filed their petition on June 19, 1953; Borriello, No. 465-53, on July 15, 1953; Goldblatt, No. 522-53, on September 2, 1953; and Johnson, No. 640-53, on November 27, 1953. Plaintiffs claim back pay for the period of service in the lower grades *233 from the dates of their respective demotions to the date of judgment.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the following plaintiffs are not entitled to recover: In case No. 266-53, John A. Adler (1), William J. Bradshaw (5), William L. Campbell (6), John K. Baker (13), Michael Gelfat (15), Fred W. Gruber (16), Eobert E. Himwich (19), Henry Horr (20), Alfred Johnson (21), Charles E. Kircher (22), Edward I. Kwitchoff (23), Alexander F. Manfredi (28), Clyde H. Pettit (30), Dickson Watson (37); in case No. 465-53, Frank Eom (8), Ernest E. Eosenstrom (9), Charles Simonson (10), Isaac Sussman (12), and Otto Ubell (14); in case No. 640-53 John F. Schneider (3), Sidney J. Smith (4); and in case No. 522-53, Joseph Petrotta (5); and their petitions are therefore dismissed.

 Except plaintiffs Schneider, Smith and Petrotta, as to whom the record contains no evidence of efficiency ratings.

 The causes of action by plaintiffs Adler, Gelfat, Himwich, Johnson, and Suss-man (all reported herewith in findings 18 through 23, 34 through 41, 44 through 49, 57 through 62, and 92 through 96, respectively) occurred later and involve issues which differ substantially from those involved in the cases of the other plaintiffs. Thus the introductory findings 2 through 16 apply to the five above plaintiffs only to the extent that they are descriptive of general conditions prevailing at the Shipyard.

 Defendant was unable, without exhaustive research, to provide complete statistics as to the total number of those demoted at the Shipyard' who appealed. It is known that at least 12S civilians in supervisory positions were demoted, of whom 23 appealed, but it is not believed this record is at all complete, nor is it ■> known if it is even representative. The complete statistics might have had a - direct bearing on the extent to which the fear of the consequences of-appeal ex- • pressed by most plaintiffs herein operated as a deterrent to appeal in the.* ■ Shipyard as a whole.

 Excepting plaintiffs Schneider, Smith, and Petrotta who are not referred to in the cited communication. Petrotta requested a review of his demotion on November 24, 1953.

 Campbell and a few other witnesses for plaintiffs testified that they or other veteran demotees had been presented with such waiver forms to sign. However, no such waiver forms were in evidence, no apparent effort was made to produce samples of them through discovery procedures (the Sussman affidavit in finding 95 is inapposite), several of plaintiff’s witnesses denied having seen or heard of the forms, and defendant’s witnesses denied the existence or use of them. It is a speculative conclusion that those witnesses who were given forms to sign erroneously recalled them to have been waiver forms, whereas more likely they would have been receipts acknowledging service of demotion notices. Most of the plaintiffs, skilled though they may have been in the proficiencies of their trades, were not trained in the intricacies of office procedures.

 Gelfat Impressed the trial commissioner as an alert and intelligent person, well able to read and to comprehend the effect of the affidavit which he signed.

The witness employing this term probably bad reference to the Bureau of Federal Supply which, in 1947, was the predecessor to the Federal Supply Service of the General Services Administration (5 U. S. C. 630 a).

 The master died In 1950 and thus was unavailable at trial. He had been a nonveteran.